Yes, Judge. And just with the new technology, can you hear me okay? Yes. We're in this together. So if you have any questions or concerns at any time, just speak up. Fair enough. Thank you, Your Honor. All right. Well, if it may please the court. Judge, the argument essentially is very similar to what Mr. Smith said with regards to the Devon Golding matter. Essentially, what my client is doing is attacking the sufficiency of the evidence in this case, saying that the government failed to prove the appropriate mental state here beyond a question you ask through count seven, which my client was charged with a conspiracy and the three violations listed within there, and then the healthcare fraud charges through counts 14 through 24. The big question is, what were the actions? Did he act knowingly and willfully? And the case that we cited, this U.S. v. Jane, sort of pulls that apart a little bit and asks the question, did the defendant know that his actions were unjustifiable and wrongful? I think one thing to do here is sort of to step back and look at the evidence that came out at trial to sort of examine those questions specifically. And I had planned on sort of going through a lot of the actions of Anthony Camillo, who was the primary witness for the case, and I think Mr. Smith did a good job of that. One thing I would add though, I think it's... Let me just ask, when I went and reviewed Jane, I remember spending a lot of time with it at the time, but it was a private sector fraud case where the conspiracy count had already been thrown out. It was an earlier version of whatever the kickback, the current kickback statute didn't exist or it wasn't an issue. And it was so it was no harm to the patients was the problem that the government brought the government's case apart in that case. That doesn't really apply either, does it? I guess, Your Honor, just with the discussion of what knowingly and willfully means is that standard of just sort of thinking at it from the standpoint of unjustifiable and wrongfully. Go ahead, Your Honor. What's inadvertent in this context? I mean, there were patients who... Not even sure the patients were the victims here. The government was the primary victim. Right, Your Honor. And I think that's a great question to ask is what is inadvertent? Because when you look at the conduct of the actors in this case, just to sort of go on with what Mr. Smith said earlier, is that Mr. Camillo was essentially taking a lot of steps to sort of hide and conceal and mislead his bad actions in this case. One of the things I think that's was that the first lab, Allegiance, was shut down because of these... It was raided by government agents. They discovered there were these kickbacks. And then he sort of takes this Allegiance lab, reopens under another one called AMS, and uses his children as essentially shill executives. There was evidence came out of trial that essentially he just handed his kids the Medicare paperwork, the application, and just said, hey, signed this, didn't explain sort of what any of it meant. And then when it comes to meeting with my client, Mr. Camillo is in St. Louis. My client is in Chicago. And it appears that Mr. Camillo is trying to expand his business into other markets. And my client has a certain connection to the government. Let me just stop you because I understand that argument, but it's kind of front end. And I thought what struck me as the most damaging evidence from your client is the way the checks flowed and that he continued. He got the checks from Camillo to flow to his wife after he had an eight-year or just on the verge of him having an eight-year exclusion. And then lying to an agent. Can a jury infer from all that? At least by that point in time, he was knowingly participating in a conspiracy. Your Honor, I see what you're saying there, but I think the actions of Camillo sort of outweigh those other issues. And I know the government is but when you look at the jury instructions in this case, what's emphasized is not the letter, it's more kickbacks. I think the letter itself tends to be sort of a red herring in this situation in that they're not, the question isn't exactly, was he violating the terms of this letter? And you see that basically his wife becomes involved in the company to sort of minimize anything he may be doing. But I think the big point to remember is that it's about kickbacks. It's not about this letter. And when it comes to the kickbacks, I don't think my client was acting to that level of being, what he was doing was knowingly or willfully. So his activity and hiding his participation in the arrangement would have had to do, your argument might be, not with anything to do with the kickback, but really just the letter of exclusion. And that was the reason that he chose to, if he did, to hide his involvement. Well, and I don't know if he, sure, your Honor, and the, I don't know if he was specifically really hiding his involvement in that case. I mean, if he did step back from his company, I think that was good. And in the spirit of what that letter was trying to tell him to do, if his wife, you know, was basically the primary manager of that company at that time, as you, you know, as evidence would show, basically as the checks coming to her, you know, I think there were steps that were trying to be took to actually act within. You don't think the inference to be drawn from that was very strong that he was, he was conscious of guilt with respect to the matter with which he's charged? I think so, your Honor, and that's because the issue isn't with the letter itself. The issue is, you know, whether or not there was, he was knowingly and willfully participating in, in, in this. I just want to make sure I understand your argument. Thank you. Thank you, Judge. So, your Honor, I laid out several items in the brief here, basically explaining, you know, that, you know, what my client would have seen would have been sort of these, what you would assume to be ordinary business functions. When he came to St. Louis, he saw a lab operating in an office building. There was nothing out of line or nefarious that appeared to be there. There was a seminar that Mr. Camillo put on and he, you know, attended that seminar. I mean, these are, by all appearances, seem to be normal business practices. And that's why I think that, you know, if you look at Mr. McTusick's conduct, it falls within that inadvertent category, where they're trying to sort of make a cutout for people that may have inadvertently run astray. But again, Judge, I don't think he's acting with that knowingly and willfully standard. If there aren't any other questions, I'll save my time for rebuttal, your Honors. What are you implying to the investigators about the money that was paid by Camillo? I'm sorry, your Honor. I lost you for one second there. What was that? The government's brief spends a couple of pages online to the investigators about the scheme with Camillo and the money being paid by Camillo. Yes, your Honor. I think if you look at that, so, and I'm just going to refer to my appendix real quick to make sure I get the dates. On the very last page, you'll see that, you know, the interaction with Camillo seems to, at least with regards to the last check that's given is in 2015. It's not until 2017 when this agent shows up. And if you look at the record, you know, it's, I don't want to stand up here and sort of disparage, you know, another government agent if I don't have to. But if you look at what happened was essentially, he, you know, had an agreement to meet with Dwight basically in a couple of days. And then, you know, he, this agent didn't just, the very next day shows up on his doorstep and sort of, you know, I think it's fair to say that my client was very much caught off guard. And I don't think he really had time to sort of prepare. I mean, if a government agent shows up at your door and starts, you know, asking you certain questions, you do your best, but it, you know, it is what it is. Okay. I have a factual question. Why is a medical equipment company that is asking for tests in the first place? What exactly, what's the connection? Sure, your honor. So I think what the record would show is that my client had specific connections to healthcare providers in Chicago and that Mr. Camillo wanted to essentially get into that, right? And I know he's working in durable medical equipment, but I think as a So this, I guess my question. So you're saying this wasn't a test that was asked for by a durable medical equipment company? No, your honor. These, the tests that were provided, or I guess the samples that were collected and provided for testing were from essentially, you know, doctor's offices, nursing homes, individuals. It wasn't by a medical equipment company. Thank you. No problem, your honor. Very good. Ms. Carroll. Thank you, your honor. May it please the court. As the court is aware, the record in this case is the same as the record in the case of Appellant Goodwin, but the court has already registered that there are some significant evidentiary distinctions between Mr. Goodwin and Mr. McTizek. Perhaps the most important of which is Mr. McTizek's interview with a special agent in 2017. And I know that Appellant's counsel said that it was after the end of the conspiracy, the conspiracy continued until 2016, and the interview took place in 2017. And I believe the Appellant's argument is that perhaps Mr. McTizek was simply taken aback and confused. But Mr. McTizek actually lied very specifically and very effectively in some respects on the nature of the kickback. It wasn't the case that he simply didn't remember the exact amounts of money. He was bought by dollars or a few numbers of patients. He misrepresented the fundamental nature of his payment structure. He repeatedly told the special agent that he did not receive fur specimen payments. Counsel, I'm getting an echo on the audio. I think that may resolve it. Okay, good. Mr. McTizek fundamentally misrepresented the nature of his payment arrangement with Mr. Camillo. He was repeatedly asked whether he had a fur specimen payment arrangement, and he said that he did not. He said that he received a flat monthly fee of $2,000 and that that was not in any way connected to the transmission of specimens to Mr. Camillo's laboratory. Mr. McTizek told the special agent that that payment was in connection with business referrals. So the very heart of the kickback agreement was what Mr. McTizek misrepresented to the special agent. He also tried to disavow any business relationship with Mr. Camillo. He said that he had started to enter into a business, but that it had never fully gotten off the ground, which was patently contradicted by the evidence before the jury. In fact, at the time of the interview, Mr. McTizek had received over $130,000 in kickback payments from Mr. Camillo. Not only that, he had had extensive email communications with Mr. Camillo laying out the terms of the kickback agreement. He had been given payments from Mr. Camillo that in the memo line directly referenced the number of specimens he was receiving and the amount of money in connection with the specimens that he had transmitted to Mr. Camillo, the very essence of the kickback arrangement. So Mr. McTizek was not so confused that he didn't manage to give statements to the special agent that would have, if they had been true, exculpated him. He did not evidence a lack of understanding of the nature of the agent's questions. He did not express confusion during that interview, and he gave very specific answers that were flatly contradicted by the evidence presented to the jury. If Mr. McTizek had believed that there was nothing wrongful about his receipt of a per-specimen kickback, then he would have had no reason to lie to the agent. And the jury could very well reasonably have inferred that his lies to the agent were evidence of the wrongfulness of his arrangement with Mr. Camillo and his Mr. McTizek was flat prohibited from participating in any aspect of the Medicare program as of November 2014. Mr. McTizek received a letter from the program explicitly advising him that he could not be connected with his submission of claims to Medicare. And I understand the court's point that perhaps that doesn't evidence knowledge of the wrongfulness of the kickback arrangement, but it certainly evidences Mr. McTizek's knowledge of the wrongfulness of continuing to participate in the program. And as the court knows, there is a three-object conspiracy charge in count seven. Two of those objects involved defrauding the healthcare program and submitting false claims to Medicare, both of which would have risen and fallen on the fact that Mr. McTizek was barred from any participation. And the jury could have reached the conclusion on any one of those objects. And as long as they did so unanimously, the verdict would have to have been sustained. There's also the fact that Mr. McTizek was married to a medical biller. Nicole McTizek, his charged co-conspirator who pledged to this conspiracy, had operated a medical billing company and listed Mr. McTizek as its agent for years before Mr. Camillo ever entered the picture. So Mr. McTizek was both in business with and married to an individual whose sole job function was to understand the Medicare regulations and ensure compliance with them. And it's not as if this was someone with whom he had a distant relationship. He was in business with his wife and she was his co-conspirator in this kickback agreement. And the jury could very well have concluded that his familiarity with the Medicare regulations... I apologize, our PA system is going off. The fact that Mr. McTizek conspired with someone whose job function it was to understand the legality of Medicare regulations was more than enough for the jury to conclude that Mr. McTizek knew that it was wrong to submit claims to Medicare both when you are debarred from the program and also when you are receiving kickbacks in exchange for submitting specimens. The evidence was ample in this case. It was more than sufficient for the jury to reach its verdict and more than sufficient to acknowledge... to establish Mr. McTizek's knowledge and intent. If the court has no further questions, I'll just rest on my breath. Very good. Mr. Brovac? Your Honor, I'll give you a minute for rebuttal. Thank you, Your Honor. I would just say that the appellant rests at this point unless the court has any further questions. No, very good. Mr. Brovac, the court appreciates your assistance as a court-appointed counsel in the case. Thank you, Your Honor. And we appreciate the help of both lawyers in making this new technology a reality.